# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-644-RDM** |
| **v.** | : | |
| | : | |
| **ADAM MARK WEIBLING,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Adam Mark Weibling to 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

## I.      Introduction

Defendant Adam Mark Weibling, a 40-year-old accounting and office manager (currently unemployed), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Defendant Weibling pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of probation with 14 days incarceration is appropriate in this case,

---

[1] Although the Statement of Offense in this matter, filed on February 17, 2022, (ECF No. 36 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

because although Weibling contends his entry was involuntary, in that he was pushed inside while protecting a lone Capitol Police officer at the Rotunda doors, it is clear that (1) Weibling should not have been at the entry of the Rotunda doors in the first place; (2) Weibling's "protection" of the officer hindered the officer's attempts to fight back the crowd; (3) Weibling did not promptly exit the building once his "protection" of the officer ended; (4) Weibling wandered the building for over 30 minutes taking video on his cellphone and then expounding his views to the crowd on an amplifying device; and (5) after January 6th, Weibling spread false information about the Capitol Riot. Furthermore, in determining a sentence, the Court must also consider that Weibling's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to disrupt proceedings and overwhelm police officers who were trying to prevent a breach of the Capitol Building. Here, the facts and circumstances of Weibling's crime support a probationary sentence with 14 days' incarceration.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 36 (Statement of Offense), at ¶¶1-7.

### *Defendant Weibling's Role in the January 6, 2021 Attack on the Capitol*

After the 2020 election, Weibling, under the Twitter username President Elect Adam Weibling @AdamWeibing, shared his views about a corrupt system and/or a rigged election, generally replying to other users or re-tweeting, otherwise described as sharing other users' posts on their page which can be viewed by the sharing party's followers. On December 22, 2021, Weibling voiced discontent with Congress, proposing it better to "march on DC, tar and feather whoever we can find in the damn congress and start over." Weibling reiterated this sentiment when replying

to a different user, "People need to rise up...It only stops when we MAKE it stop."  See below images.



<table>
<tr><td style="text-align:center">*Image 1*</td><td style="text-align:center">*Image 2*</td></tr>
</table>

The following day, December 23, 2020, Weibling tweeted his intent to attend the January 6th "Stop the Steal" rally in Washington, DC.  The next day, his wife purchased airline tickets for them to attend that rally.

On January 6, 2021, after attending the Stop the Steal rally, Mr. and Mrs. Weibling traveled to the east side of the U.S. Capitol.  At or before 2:33 p.m., Weibling, wearing a white-collared shirt and tan jacket, climbed the steps leading to the East Rotunda doors, also known as the Columbus doors, of the U.S. Capitol Building.[2]  At this time, there was a large crowd both on the steps to and immediately outside the East Rotunda doors.  See below images; Weibling is circled in red in all images included in this memorandum.  Not visible in the below images are a small crowd of rioters inside the building attempting to open the East Rotunda doors and a sole Capitol Police officer in SWAT gear thwarting (temporarily) their attempts.

---

[2] There is no known evidence that Mrs. Weibling approached this entrance to the Capitol.  There is no known evidence that Mrs. Weibling or her parents, who also attended the January 6th Stop the Steal" rally,  entered the U.S. Capitol on January 6, 2023.

 

*Image 3*                     *Image 4*

By 2:37 p.m., the East Rotunda doors were opened and the sole Capitol Police Officer,

B.A., continued to limit, or attempted to limit, access to the Capitol by blocking the doorway and

yelling to the crowd, "get back" and "get out of the building." While in the doorway, Officer B.A.,

pushed and assaulted by persons in the crowd, yelled "don't touch me." At approximately 2:39

p.m., a flagpole was aimed to strike Officer B.A., and Weibling swatted the flagpole away. See

ECF 36 ¶ 8



*Image 5*                      *Image 6*

In the above images, Officer B.A. (in yellow circle) is being jostled by the crowd while someone from inside the building stretches a flagpole to strike him. Weibling outstretched his right arm to swat the flagpole. Within a few seconds both Officer B.A. and Weibling were pushed further into the U.S. Capitol and ended up to the left of the door. See below image at 12:39 p.m. While standing with Officer B.A. to the left of the East Rotunda doorway, Weibling both blocked rioters from reaching Officer B.A. and blocked Officer B.A. from returning to his post which allowed rioters to stream into the building.



*Image 7*

After about two minutes inside the Capitol, Weibling backed away from Officer B.A. and headed towards the Rotunda.  Image 8 below shows that when Weibling made his way towards the Rotunda, at 2:41 p.m., the East Rotunda doorway/exit was relatively clear from the inside of the building.



*Image 8*

Weibling entered the Rotunda at 2:42 p.m. and walked around the room.  He then approached an officer and covered an eye, as though to complain of eye irritation.

After this encounter, Weibling had another rioter flush his eye out with water.  At 2:46 p.m., Weibling approached the East Rotunda doors (first image below), but did not exit, returning to the Rotunda (second image below).



*Image 9*                                                  *Image 10*

Weibling then roamed through the Rotunda of the U.S. Capitol. At one point Weibling entered the North Rotunda hallway that leads to the Old Senate Chamber area but returned to the Rotunda within minutes.  Weibling then wandered the Rotunda for approximately 15 minutes, speaking into his cellular telephone and using it to record the scene.



*Image 11*

At approximately 3:00 p.m., Weibling approached another rioter, who was speaking over a Go Pro recording device and amplifier.  Weibling used this device for about a minute while the other rioter used his phone to scan the room and take photographs.[3]

 

*Image 12*                                        *Image 13*

At approximately 3:02 p.m. several law enforcement officers entered the Rotunda and soon directed all rioters toward the Rotunda East door exit.  At approximately 3:09 p.m., Weibling walked toward East Rotunda Doors as part of a large crowd.  See image below.



*Image 14*

---

[3] The FBI has no information that this recording was livestreamed or subsequently posted on social media.

Weibling exited the U.S. Capitol Building at 3:11 p.m.  ECF 36 ¶ 8.  In total, Weibling spent 28 minutes inside of the Capitol Building.  Weibling has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so, and he willfully and knowingly paraded or demonstrated.  ECF 36 ¶ 9.

*Social Media Posts*

After the attack on the Capitol, Weibling continued to support the riot regardless of the violence he had seen.  In the evening hours of January 6, 2021, Weibling responded to tweets downplaying the events the Capitol.  In the three noted tweets below, he professed:  (image 1) that the violence about January 6th is rhetoric from the media because the "unarmed protestors were maced, beaten by batons, and shot"; (image 2) that the "protestors were the brave unarmed people actually getting hurt. No one was hurt but the protestors here..."; and (image 3) in response to headline about violence and vandalism at the Capitol, Weibling re-defines defined vandalism as something lesser than "breaking in" (Image 17).



*Image 15*



*Image 16*

9



*Image 17*

On the following day, January 7, 2021, Weibling continued his support of the riot by downplaying the "breaking and entering, pushing past police" as merely aggression by "unarmed protestors desperate people who just want an audit and are getting pepper sprayed just try to make their voices heard."  See image below.



*Image 18*

Despite having watched a mob attack Officer B.A., whom Weibling now contends he protected, Weibling's tweets claimed no violence occurred on officers and none included his

current contention that he came to the aid of an officer on January 6, 2021. About a week after these and similar posts, on or about January 15, 2021, Weibling closed his Twitter and Facebook accounts as no other social media posts are known. In law enforcement's review of Weibling's January 6th social media posts, none show signs of contrition or remorse for the events or for his own conduct on January 6th.

*The Charges and Plea Agreement*

On May 19, 2021, the United States charged Weibling by criminal complaint with violating 18 U.S.C. §§1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On May 25, 2021, law enforcement officers arrested him outside his home near Houston, Texas. On October 26, 2021, the United States charged Weibling by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On July 14, 2022, pursuant to a plea agreement, Weibling pleaded guilty to Count Four of the Information, charging him with a violation of Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Defendant agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

Weibling now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Weibling's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Weibling, the absence of violent or destructive acts is not a mitigating factor. Had Weibling engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Weibling's case is what weight, if any, should be given in his sentencing for parading inside the Capitol on January 6th, for his alleged protection of Officer B.A. as he entered the U.S. Capitol.  As noted above, Weibling was already up the Capitol steps and at the front of the mob when the East Rotunda doors opened and Officer B.A. yelled "get

back" and "get out of the building." Weibling witnessed the violence against officers as he entered the East Rotunda doors. As Images 5 and 6 show, Weibling was already in the Capitol Building when he allegedly assisted Officer B.A., as part of the unruly mob that Officer B.A. was specifically trying to keep out of the Capitol Building. Weibling himself likely sustained injuries from the mob, as he later rubbed his head while in the Rotunda. He also washed out his eyes, indicating that a chemical spray or tear gas was either was being used by officers to stop breaching rioters or by the violent rioters themselves. Regardless of the violence and chaos he witnessed and Officer B.A.'s explicit requests for the rioters to leave the building, Weibling chose to wander the Rotunda, record the scene and use another's recording/amplifying device to profess his views, stayed inside the Capitol Building for over half an hour during one of the most turbulent times during the riot, and later shared false information about violence on that day. Weibling's attempts to appear remorseful during his November 2022 presentence interview with Probation are belied by those social media posts.

### B. The History and Characteristics of Weibling

As set forth in the PSR, Weibling's criminal history consists of four dated misdemeanor arrests for assault, two of which involve his wife, and a single municipal infraction of public intoxication. ECF 42 ¶¶ 22-29. Charges on each of the assaults were dismissed; one after a term of deferred adjudication even though court records suggest this family violence charge was to be a conviction. ECF 42 ¶ 24. Weibling's criminal history is concerning not just because it involves four separate violent acts but because he has faced no consequence for any of them. Weibling is a college educated, married man without children, currently unemployed and supported by his wife, the alleged victim of two of the 13-year-old assaults. ECF 42 ¶¶ 33, 34, 44, 45, 47.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you

send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Weibling's criminal history of assaults, none of which led to convictions or jail time; his remaining in the Capitol Building for over half an hour despite the violence and chaos he witnessed during his entry into the building; his post-January 6th false statements undermining the truth about violence and the treatment of officers on that day; and Weibling's failure (to date) to broadcast any remorse (outside of his November 2022 statement to Probation, after he was set for sentencing), demonstrate a need for specific deterrence.  In this case, a sentence of 14 days' confinement with probation is warranted to underscore that Weibling's conduct is criminal, and to deter him from engaging in future lawless conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Weibling based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Weibling has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a)

factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71

(ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar). Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in the following cases.

In *United States v. Matthew Mazzocco*, 1:21-CR-54 (TSC), the defendant also pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G).  Similar to Weibling, Mazzocco attempted to help during the riot (Mazzocco warned others not to take or break any property) and acted friendly with officers (he gave an officer in riot gear a fist bump); he did not immediately leave the Capitol Building (he was inside for 12 minutes); he posted about January 6th to social media (the day of the riot he posted on Facebook, "The capital is ours!"); he witnessed chaos inside and outside the Capitol (at around 2:46 p.m., he took a selfie in front of the chaotic push at the East Rotunda doors); and his expressions of contrition were belied by his communications (he sent text messages to family and friends shortly after January 6th, asserting that is was "not a riot," and that the group "antifa" was responsible for the violence of the day). *See Mazzocco*, 1:21-CR-00054 (TSC), Government's Sentencing Memorandum, ECF 28.   Distinct from Weibling, Mazzocco did make it further into the Capitol, not just the Crypt/Rotunda area, but into the more sensitive Spouse's Lounge.  Judge Chutkan sentenced Mazzocco to 45 days' incarceration.

In *United States v. Boyd Camper*, 1:21-cr-325 (CKK), the defendant also pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G).  Similar to Weibling, Camper left his family outside the Capitol and went in by himself; he entered the Capitol Building despite seeing violence between rioters and officers (he saw officers being pushed and got tear gas in his eyes); he entered the Capitol Building during a particularly turbulent time in the riot (at 2:45 p.m.); he claimed to have helped prevent violence (he allegedly grabbed a pitchfork from another rioter and threw it to the ground because he did not want any violence); and he subsequently made public statements indicating a complete lack of remorse (during a CBS News interview later that day he said , "We're going to take this damn place… it's called the insurrection act and we the people are ready"). *Camper*, 1:21-cr-325 (CKK), Government's Sentencing Memorandum, ECF 30.  Distinct from Weibling, Camper concealed and likely destroyed video and audio evidence collected by the Go-Pro camera he brought inside the Capitol.  Judge Kollar-Kotelly sentenced Camper to two months' incarceration.

In *United States v. Paul Colbath*, 1:21-CR-650 (RDM), the defendant also pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G).  Similar to Weibling, Colbath helped someone during the riot (he assisted another rioter who had been affected by chemical spray); he saw violence and chaos before entering the Capitol Building (he texted his wife, "Wild. Tear Gas at Capitol," saw officers with riot shields, and saw crowds pushing past officers trying to protect the Senate Fire Door); and he entered the Capitol Building during a particularly turbulent time in the riot (at 2:45 p.m.).  *See Colbath*, 1:21-CR-650 (RDM), Government's Sentencing Memorandum, ECF 28. However, distinct from Weibling, Colbath stayed inside in the Capitol Building for only about five minutes (including the time he spent helping the other rioter affected by chemical spray), he did not appear to post about January 6th on social media, he readily admitted his guilt, he expressed

substantial remorse, and he offered to cooperate with law enforcement in any way he could. Accordingly, under the special circumstances of that case, the Government recommended, and this Court gave, a home detention sentence for Colbath. Specifically, this Court sentenced Colbath to 30 days' home detention.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. [5]

---

[5] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); see generally Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    _____
Graciela Rodriguez Lindberg
Assistant U.S. Attorney
Southern District of Texas- Detailee
Texas Bar No. 00797963
11204 McPherson Road, Suite 100A

---

in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

Laredo, Texas  78045
956-723-6523 (office)
956-754-9350 (cell)
graciela.lindberg@usdoj.gov

### CERTIFICATE OF SERVICE

On this 21st day of February 2023, a copy of the foregoing was served on defense via email and also served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ *Graciela R. Lindberg*
Graciela R. Lindberg
Assistant U.S. Attorney